IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JUDITH A. NEELLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:14-CV-269-WKW |
| | ) | [WO] |
| CLIFFORD WALKER, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This case challenges the constitutionality of an Alabama law affecting parole eligibility for certain inmates.  No State shall, under Article I, Section Ten of the United States Constitution, pass any bill of attainder or *ex post facto* law.  U.S. Const. art. I, § 10, cl. 1.  To attack a state statute on these grounds, a challenger must bring suit within the temporal limitations period ascribed to her cause of action.  And time, like the tide, waits for no one.[1]

Before the court is Defendants' Motion for Summary Judgment (Doc. # 41), which has been fully briefed.  Upon consideration of the evidence, the arguments of counsel, and the relevant law, the motion is due to be granted.

---

[1] *See* CHARLES DICKENS, LITTLE DORRIT 674 (Oxford Univ. Press 1987) (1857) ("'And now,' said Daniel, looking at his watch, 'as time and tide wait for no one, my trusty partner, and as I am ready for starting, bag and baggage, at the gate below, let me say a last word.'").

# I.  JURISDICTION AND VENUE

Subject-matter jurisdiction is exercised pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).  The parties do not contest personal jurisdiction or venue.

# II.  STANDARD OF REVIEW

To succeed on a motion for summary judgment, the moving party must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The evidence and the inferences from that evidence must be viewed in the light most favorable to the nonmoving party.  *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

On a motion for summary judgment, the moving party "always bears the initial responsibility of informing the district court of the basis for its motion."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact.  *Id*.  If the moving party does not bear the trial burden of production, it may assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact.  Fed. R. Civ. P. 56(c)(1)(B); *see also* Fed. R. Civ. P. 56 advisory committee's note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials. . . .  [A] party who does not have the trial burden of production may rely on a

showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact."). If the moving party meets its burden, the burden shifts to the nonmoving party to establish—with evidence beyond the pleadings—that a genuine dispute of material fact exists as to each of its claims for relief. *Celotex*, 477 U.S. at 324. A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

## III. BACKGROUND

The events giving rise to this case have been in motion since 1982. The facts will be recounted as they relate to Plaintiff's conviction, the commutation of her sentence, the state legislature's response to the commutation, and other events leading up to the filing of the instant lawsuit. The procedural history will also be briefly discussed.

### A.   Facts

In September of 1982, Judith Neelley ("Neelley") abducted and murdered a teenage girl.[2] The State of Alabama charged Neelley with capital murder, and a jury found her guilty of the offense. *Neelley v. State*, 494 So. 2d 669, 670 (Ala.

---

[2] The details of Neelley's criminal act have been exhaustively recounted in other fora. *See, e.g., Neelley v. Nagle*, 138 F.3d 917, 920 (11th Cir. 1998); *Neelley v. State*, 494 So. 2d 669, 690–91 (Ala. Crim. App. 1985). Suffice it say that Neelley's actions were, in the words of her counsel, "heinous and terrible." (Doc. # 20, at 1.)

Crim. App. 1985). The jury recommended life imprisonment without parole, but the court sentenced Neelley to death. *Id.* Neelley exhausted all state and federal remedies for challenging her conviction and sentence. *See Neelley v. Nagle*, 183 F.3d 917, 920–21 (11th Cir. 1998) (explaining the results of Neelley's direct and collateral attacks). She is currently in custody at Tutwiler Prison for Women ("Tutwiler") in Wetumpka, Alabama. (Doc. # 13, at 3.)

In January of 1999, Governor Fob James ("James") commuted Neelley's death sentence to a sentence of life imprisonment.[3] (Commutation Letter, Doc. # 42-1, at 1.) In the commutation letter, James did not indicate whether this life sentence would be with or without the possibility of parole. (*See* Commutation Letter, Doc. # 42-1, at 1.) James later explained that, when he issued the commutation letter, he assumed Neelley would be ineligible for parole. (*Post Article*, Doc. # 42-4, at 5.) An Alabama statute in effect at that time provided that any person whose sentence was commuted to life imprisonment would not be eligible for parole until he or she served at least fifteen years of the life sentence. Ala. Code § 15-22-27(b) (1975) (amended by Act 2003-300). Alabama law also provided, however, that any person convicted of a capital offense shall be sentenced either to "life imprisonment without parole or to death." Ala. Code § 13A-5-39 (1975).

---

[3] Neelley's is the only death sentence to be commuted since 1962. (Factual Stip., Doc. # 42-2, at 1.)

4

In the wake of James's vague commutation letter, the Alabama Board of Pardons and Paroles (the "Parole Board") sought the opinion of the Alabama Attorney General as to the commutation's effect. (*See* Atty. Gen. Op., Doc. # 59-1, at 2.) The Parole Board wanted to know generally, in light of the statute providing that a person convicted of a capital offense can only be sentenced to life imprisonment without parole or death, Ala. Code § 13A-5-39 (1975), whether the Governor's commutation of a death sentence results in (1) a sentence of life imprisonment with the possibility of parole or (2) life imprisonment without the possibility of parole. (Atty. Gen. Op., Doc. # 59-1, at 2.)

In response to this request, the Attorney General opined that the Governor's authority to commute a sentence to life with or without parole was not constrained by that particular statutory provision. (Atty. Gen. Op., Doc. # 59-1, at 8.) Because the Governor's authority to commute a sentence derives from the state constitution, the Attorney General reasoned, the Governor is free to commute a death sentence to either life imprisonment with the possibility of parole or life imprisonment without the possibility of parole. (Atty. Gen. Op., Doc. # 59-1, at 9.) The Opinion further provided that, when the Governor exercises his constitutional authority to commute a death sentence, whether the sentence of imprisonment is to be served with or without the possibility of parole "depends directly upon the specific order of the Governor." (Atty. Gen. Op., Doc. # 59-1, at 2.)

Though this Opinion clarified that the Governor was authorized to commute a death sentence to life imprisonment with or without parole, it did not directly address the effect of James's commutation letter on Neelley's parole eligibility. (*See generally* Atty. Gen. Op., Doc. # 59-1.)  It merely determined that the effect of the commutation depends on the specific order of the Governor, and James's commutation order did not specify whether Neelley was to serve her life sentence with or without the possibility of parole.  (*See* Commutation Letter, Doc. # 42-1.)

On March 8, 1999, the Parole Board sent a notice to Neelley indicating that it had reviewed her case and scheduled her for an initial parole consideration in January of 2014.  (1999 Notice, Doc. # 59-2, at 17.)  In October of 2001, Neelley's counsel wrote a letter to the Parole Board requesting that Neelley be scheduled immediately for an initial parole consideration.  (2001 Ragsdale Letter, Doc. # 59-2, at 19.)  The Parole Board, relying on Ala. Code § 15-22-27(b) (1975), responded that Neelley could not be considered for parole until fifteen years after the date of her commutation.  (2001 Parole Bd. Letter, Doc. # 59-2, at 20.)  The Parole Board maintained its position that Neelley could not be scheduled for an initial parole consideration until January of 2014.  (2001 Parole Bd. Letter, Doc. # 59-2, at 22.)

Neelley later filed an action in the Montgomery County Circuit Court seeking a declaration of her rights with respect to parole eligibility under then-existing law.  (Cir. Ct. Order, Doc. # 42-3, at 1.)  The Parole Board took the

position, as it had in its 2001 letter, that Ala. Code § 15-22-27(b) (1975) required that Neelley could only be eligible for parole consideration fifteen years after James commuted her sentence.  (Cir. Ct. Order, Doc. # 42-3, at 2.)  The court confirmed the Parole Board's interpretation in an order dated July 22, 2002, finding that Neelley "shall not become eligible for parole until at least [fifteen] years from January 15, 1999." (Cir. Ct. Order, Doc. # 42-3, at 3.)

In 2003, the Alabama Legislature took a course of action that now forms the basis of Neelley's suit.  It passed Act 2003-300 (the "Act"), which amended Ala. Code § 15-22-27(b).  (Act 2003-300, Doc. # 42-6.)  The Act provides, among other things, that "[a]ny person whose sentence to death has been commuted by the Governor shall not be eligible for parole."  (Act 2003-300, Doc. # 42-6, at 2); Ala. Code § 15-22-27(b) (2016).  The Act took effect on September 1, 2003, but its terms were made retroactive to September 1, 1998.  (Act 2003-300, Doc. # 42-6, at 3.)  It further provides that "[t]he Board of Pardons and Paroles shall not grant a parole or pardon to a person whose sentence of death has been commuted by the Governor" unless certain conditions are met.  (Act 2003-300, Doc. # 42-6, at 3); Ala. Code § 15-22-27(d) (2016).  Subsection (a) provides that a person is only "eligible for a *pardon*" if there is sufficient evidence to show that he or she is innocent of the crime for which she was convicted, the Parole Board votes unanimously to grant a pardon, and the Governor agrees that a pardon is

7

appropriate.  (Act 2003-300, Doc. # 42-6, at 2); Ala. Code § 15-22-27(a) (emphasis added).  Subsection (a) does not provide any circumstances under which a person whose death sentence is commuted may be eligible for *parole*.  (*See* Act 2003-300, Doc. # 42-6, at 2); *See* Ala. Code § 15-22-27(a).

The Act garnered substantial attention from the press.  (*See, e.g., Montgomery Advertiser* Art., Doc. # 42-5, at 3.)   Neelley acknowledges that by October 1, 2003, she had at least "heard and read about" the Act.  (Neelley Disc. Resp., Doc. # 42-8, at 7.)   Though she was aware of the Act's passage, she "believed [the Act] could not be constitutionally applied to [her] case."  (Neelley Disc. Resp., Doc. # 42-8, at 7.)  At some point before September of 2004, Neelley approached Gladys Deese ("Deese"), who was the Tutwiler Warden at the time, and asked Deese about the Act's applicability to her case.[4]  (Deese Decl., Doc. # 42-9, at 2.)  Deese expressed her opinion that the Act barred Neelley from parole consideration and encouraged Neelley to consult an attorney.  (Deese Decl., Doc. # 42-9. at 2.)

In May of 2006, attorney Julian McPhillips ("McPhillips") wrote Neelley a letter urging her to contact an attorney to see whether she had a viable *ex post facto*

---

[4] Neelley contends, in opposition to Defendants' motion for summary judgment, that she does not recall having this conversation with Deese.  (Doc. # 59, at 3.)  This contention comes by way of argument of counsel in Neelley's brief and is unsupported by citation to evidence in the record.  Without evidentiary citation, this factual position is not properly supported and thus does not rebut Deese's testimony concerning this conversation.  *See* Fed. R. Civ. P. 56(c)(1).

case against the Act.  (2006 McPhillips Letter, Doc. # 42-11.)  Though McPhillips did not represent Neelley at the time of the 2006 letter, he eventually would take up her case.  (Neelley Disc. Resp., Doc. # 42-8, at 3 (noting that McPhillips was Neelley's attorney as of March 19, 2009).)  McPhillips again wrote Neelley in 2009,[5] indicating that he believed the Act ran afoul of the *ex post facto* clause of the Constitution.  (2009 McPhillips Letter, Doc. # 42-10, at 5.)

McPhillips penned his 2009 letter the same day that a Montgomery newspaper published a story about the Act and its effect on Neelley's sentence. The article, which appeared in the *Montgomery Advertiser* (the "*Advertiser*") on January 15, 2009,[6] included quotations from Steve Sirmon ("Sirmon"), a Parole Board attorney.  (*Advertiser* Art., Doc. # 42-5, at 3.)  Sirmon explained that the Act made Neelley ineligible for parole, but that the Parole Board had not taken the time to correct this error in its administrative records.  (*Advertiser* Art., Doc. # 42-5, at

---

[5] McPhillips transmitted this letter to Neelley via fax.    (Doc. # 42-10, at 1–4.)  Frank Albright, who was the Tutwiler Warden in 2009, declared that he delivered the faxed letter to Neelley when he received it from McPhillips.  (Albright Decl., Doc. # 42-10, at 1–2.)  He had Neelley sign the fax to confirm that she received the letter.  (Albright Decl., Doc. # 42-10, at 2.)

[6] Defendants included a copy of this article in their evidentiary submissions along with the declaration of Alvin Benn, who authored the article.  (Doc. # 42-5, at 1.)  Neelley does not object to the consideration of the article or the statements contained therein in conjunction with Defendants' motion for summary judgment.  She merely offers evidence showing that, despite Sirmon's promise to the contrary, no one ever changed Neelley's records.  (*See* Doc. # 59, at 4.) Because Neelley does not object to the inclusion of this article as evidence, it will only be referenced here to provide a full understanding of the circumstances surrounding Neelley's case.
  To the extent Defendants rely on the *Advertiser* article for the truth of the matter asserted therein, the article is hearsay.  *See* Fed. R. Evid. 801(c).  Without the benefit of argument from counsel regarding the limited purposes for which this evidence may properly be considered, it will not be relied upon in resolving the instant motion.

3.)  Despite Sirmon's promise to correct Neelley's prison record to reflect that she was ineligible for parole, a 2014 search of Neelley's record still showed that she was serving a sentence of "Life with Parole Possible."  (Ala. Dep't of Corr. R. Search, Doc. # 59-2, at 31.)  McPhillips responded to this article with a letter to the editor, which the *Advertiser* published on January 24, 2009.  (McPhillips Letter to the Ed., Doc. # 42-8, at 27.)  In his letter, McPhillips reiterated his position that the Act was an unconstitutional *ex post facto* law.  (McPhillips Letter to Ed., Doc. # 42-8, at 27.)

The Parole Board held a meeting on January 20, 2009.  (Parole Bd. Mins., Doc. # 42-12, at 8.)  The minutes from this meeting confirm the Parole Board's position that, under then-existing law, Neelley was "barred from parole."  (Parole Bd. Mins., Doc. # 42-12, at 8.)  Despite its understanding that Neelley was ineligible for parole, the Parole Board decided to maintain her 2014 parole consideration date.  (Parole Bd. Mins., Doc. # 42-12, at 8.)  The 1986 version of the Parole Board's Operating Rules provides that a parole calendar date "is for initial parole consideration and is not a presumptive parole date."[7]  (Bryant Decl.,

---

[7] Under the 1986 Parole Board Operating Rules, when a case was ineligible for parole, no parole calendar date was to be established.  (1986 Op. Rules, Doc. # 42-12, at 23.)  This provision does not appear in the 2001 Operating Rules.  (Doc. # 42-12, at 68.)  At the time of Neelley's conviction, the Act did not bar her from parole because it was not yet in existence. Accordingly, this provision would not have affected the scheduling of Neelley's initial parole consideration hearing.  The 2001 version of the Operating Rules makes clear that the Parole Board's setting of a parole consideration date does not indicate that the Parole Board will grant parole.  (2001 Op. Rules, Doc. # 42-12, at 69.)

Doc. # 42-12, at 3; 1986 Op. Rules, Doc. # 42-12, at 20.)   The 2001 version of the Parole Board's Operating Rules also provides, however, that none of the rules should be construed to conflict with Alabama law.  (Bryant Decl., Doc. # 42-12, at 3; 2001 Op. Rules, Doc. # 42-12, at 68.)

Neelley's counsel continued to seek clarification of her eligibility for parole. In November of 2010, McPhillips wrote a letter to the Parole Board requesting an earlier parole consideration date.  (2010 McPhillips Letter, Doc. # 59-3, at 2.)  The Parole Board responded that Neelley could not be "eligible for parole consideration" until January of 2014.  (2010 Parole Bd. Letter, Doc. # 59-4, at 2.) McPhillips wrote a similar letter in July of 2012, again requesting that the Parole Board schedule Neelley for parole consideration earlier than 2014.[8]   (2012

---

[8] In her brief in opposition to the motion for summary judgment, Neelley quotes, at length, the language of McPhillips's 2010 and 2012 letters, focusing on certain confirmatory language included therein.  (Doc. # 59, at 9.)  In the 2010 letter, for example, McPhillips wrote:

> Thank you for informing me today that you have determined that Judith Ann Neelley will be eligible for parole by no later than October, 2014.  You also informed me that, although the legislature passed a law in 2003, attempting to nullify the effect of Gov. James' commutation of Ms. Neelley's death penalty to a plain "life sentence" (as opposed to "life without parole"), said law was never codified.  You indicated that this was probably due to the law's *ex poste* [sic] *facto* effect.  Therefore, I understand the Alabama Board of Pardons and Parole [sic] is not being influenced by that law.

(2010 McPhillips Letter, Doc. # 59-3, at 2.)  McPhillips included similar language in his 2012 letter, purportedly confirming certain statements Parole Board representatives made to him in a separate conversation.  (*See* Doc. # 59-5, at 2.)

Defendants contend that these statements are hearsay and cannot be relied upon to establish that the Parole Board represented to McPhillips that the Act would not apply to Neelley.  (Doc. # 60, at 14.)  It is worth noting that in neither response letter did the Parole Board

McPhillips Letter, Doc. # 59-5, at 2.)  The Parole Board responded again that it would not change her 2014 parole consideration date.  (2012 Pittman Letter, Doc. # 59-2, at 27.)

When January of 2014 arrived, the Parole Board sought the opinion of the Alabama Attorney General regarding the Act's effect on Neelley's parole eligibility.  (Op. Request, Doc. # 59-6, at 34.)  In its request for an opinion, the Parole Board noted that, for scheduling purposes, it generally looks to the commission date of the underlying offense to determine the applicability of laws affecting parole eligibility.  (Op. Request, Doc. # 59-6, at 35.)  Because Neelley's offense occurred in 1982, and because the Act's retroactivity clause only reached back as far as 1998, the Parole Board was unsure of how to docket Neelley's parole consideration case.  (Op. Request, Doc. # 59-6, at 35.)  The Parole Board ultimately asked whether the Act barred it from considering Neelley for parole. (Op. Request, Doc. # 59-6, at 35.)

In Opinion 2014-051, the Alabama Attorney General concluded that, under the Act, an inmate whose death sentence was commuted to life after September 1, 1998, is not eligible for parole.  (Doc. # 20, at 27.)  In the opinion, the Attorney General noted that the Act plainly rendered ineligible for parole any inmate whose

---

ratify these statements about the Act's applicability to Neelley.  (*See* Docs. # 59-4, at 2 and 59-2, at 27.)  The Parole Board merely reiterated its position that Neelley could not be scheduled for an initial parole consideration date until 2014.  (Docs. # 59-4, at 2 to 59-2, at 27.)  Defendants' arguments are well taken, and these hearsay statements in McPhillips's letters will not be relied upon for the resolution of the instant motion.

death sentence was commuted to life imprisonment.  (Doc. # 20, at 29.)  On April

1, 2014, the Parole Board notified Neelley that she was "barred from parole."

(2014 Notice, Doc. # 59-2, at 29.)

## B.   **Procedural History**

Neelley initiated this action on April 10, 2014.  (Doc. # 1.)  Her original

complaint named the Parole Board, instead of its individual members, as the

defendant.  The Parole Board moved to dismiss the original complaint (Doc. # 11),

and Neelley filed an amended complaint (Doc. # 13) in which she named current

members of the Parole Board as defendants.  The Parole Board's initial motion to

dismiss was accordingly denied as moot.  (Doc. # 16.)

The current Defendants, Robert P. Longshore, Clifford Walker, and William

W. Wynne Jr., moved to dismiss Neelley's amended complaint.  (Doc. # 18.)  This

motion was granted in part and denied in part.  (Doc. # 22.)  The motion was

granted with respect to Neelley's state-law claims, but denied with respect to her

federal-law claims.  (*See* Docs. # 13 and 22.)

Defendants then filed the instant motion for summary judgment (Doc. # 41),

submitting evidence (Doc. # 42) and a brief (Doc. # 43) in support of the motion.

Neelley filed a brief in response contemporaneously with exhibits (Doc. # 59), and

Defendants filed a reply (Doc. # 60.)

## IV.  DISCUSSION

Before wrestling with the merits of Neelley's claims, Defendants argue that they are entitled to summary judgment because this action is untimely under the relevant statute of limitations.   Addressing the substance of Neelley's claims, Defendants also contend that the Act constitutes neither an *ex post facto* law nor a bill of attainder.  Because summary judgment is due to be granted by operation of the statute of limitations, the merits considerations will not be reached.

In general terms, a statute of limitations creates a temporal limit within which a claimant must initiate her claim for relief.  *CTS Corp. v. Waldburger*, 134 S. Ct. 2175, 2182 (2014).   These limitations periods are designed to promote justice by encouraging claimants to bring their actions before the claim goes stale. *Order of R.R. Telegraphers v. Ry. Express Agency*, 321 U.S. 342, 348–49 (1944). The limitation period, which varies based on the nature of the cause of action, begins to run at the time the claim accrues.  *Waldburger*, 134 S. Ct. at 2182.

The law governing statute of limitations issues will be applied to the circumstances of Neelley's case.   First, the relevant limitations period will be established.   Second, the accrual of Neelley's cause of action will be addressed. Finally, Neelley's plea for equitable tolling will be considered.

**A.**     **The Governing Limitations Period**

The parties agree that the applicable limitations period is two years.  Neelley brought this action pursuant to 42 U.S.C. § 1983, for which there is no federal statute of limitations.  Federal courts must look to state law for the applicable statute of limitations in a § 1983 action, applying the state limitations period prescribed for general personal injury actions.  *Wilson v. Garcia*. 471 U.S. 261, 276 (1985); *see* 42 U.S.C. § 1988(a).  Alabama's two-year statute of limitations for general personal injury actions applies to Neelley's § 1983 action.  *See Powell v. Thomas*, 643 F.3d 1300, 1303 (11th Cir. 2011) (per curiam); Ala. Code § 6-2-38(l).  Because Neelley initiated this suit on April 10, 2014, her claim is barred if it accrued prior to April 10, 2012.

**B.**     **When the Cause of Action Accrued**

The statute of limitations begins to run at the time the claim accrues.  *Rozar v. Mullis*, 85 F.3d 556, 561–62 (11th Cir. 1996).  Federal law, which governs the accrual inquiry, provides that a claim accrues when "the facts which would support a cause of action are apparent or should be apparent to a person with reasonably prudent regard for his rights."  *Id.* at 562 (quoting *Drayden v. Needville Indep. Sch. Dist.*, 642 F.2d 129, 132 (5th Cir. 1981)).  A court tasked with resolving the question of accrual must first determine what constitutes the alleged injury.  *Rozar*, 85 F.3d at 562.  It must then determine when the plaintiff knew she could bring an

action to redress that injury.  *Id.*  Applying these principles to the facts at bar, it is clear that Neelley's claim accrued before April 10, 2012.

### 1.   *Neelley's Injury*

The passage of the Act constitutes Neelley's injury for purposes of resolving the statute of limitations issue.  This conclusion follows from two legal principles, each of which will be addressed in relation to Neelley's claims.  First, when ascertaining the relevant injury, courts must focus on the moment of the adoption of the unconstitutional act itself rather than the moment at which the claimant experiences its effects.  *See, e.g.*, *Chardon v. Fernandez*, 454 U.S. 6, 8 (1981) (per curiam).  Second, because Neelley's challenge is premised on a constitutional provision that proscribes the enactment of certain laws, it is the passage of the Act that inflicted her alleged injury.  *See, e.g., Smith v. City of Enid*, 149 F.3d 1151, 1154 (10th Cir. 1998) (holding that, based on the nature of the constitutional claim, the injury occurred at the time of the challenged statute's passage).

The focus of the accrual inquiry is the allegedly unconstitutional act rather than the moment the claimant feels the painful consequences of the act.  *Chardon*, 454 U.S. at 8.  This principle has been applied across a variety of contexts. [9]  In an employment discrimination case, for example, the Supreme Court has held that a

---

[9] *See, e.g., Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916 (9th Cir. 2004) (non-renewal of professional license); *Cathedral of Joy Baptist Church v. Village of Hazel Crest*, 22 F.3d 713 (7th Cir. 1994) (denial of special use permit); *Baker v. Bd. of Regents*, 991 F.2d 628 (10th Cir. 1993) (denial of professional school admission).

former employee's cause of action accrued on the date he received notice that he would be terminated on some future date, not on the date that his employer finalized the termination.  *Id.*  It was at the moment the employer made the decision to terminate, a decision allegedly made for unlawful reasons, that the injury occurred. *Id.*

The Eleventh Circuit has embraced a similar principle in the context of an inmate's challenge to changes in parole policies.  *See Brown v. Ga. Bd. of Pardons & Paroles*, 335 F.3d 1259 (11th Cir. 2003) (per curiam).  In *Brown*, an inmate challenged a change in Georgia's parole board policy that decreased the frequency of parole reconsiderations.  *Id.* at 1260.  Under the policy in effect at the time of Brown's conviction, the parole board was required to reconsider inmates for parole every three years.  *Id.*  The parole board adopted a new policy in 1995, however, that allowed it to reconsider inmates for parole up to eight years from the inmate's last parole denial.  *Id.*  This new policy applied retroactively such that it affected prisoners who, like Brown, had already been convicted and denied parole prior to 1995.  *Id.*  The parole board denied Brown relief in 1995, and, pursuant to the new policy, set his reconsideration date for September of 2000.  *Id.*  The parole board again denied him relief in 2001, and set his reconsideration date for 2007.  *Id.*  Brown brought a § 1983 action in 2002, alleging that the 1995 policy that allowed

the board to lengthen the interval between parole reconsiderations was an unconstitutional *ex post facto* law. *Id.*

Holding that Brown's § 1983 suit was untimely under the relevant statute of limitations, the Eleventh Circuit recognized that the action accrued in 1995 when the parole board adopted its new reconsideration policy and made it apply retroactively. *Id.* at 1261. Brown argued that he suffered a new injury in 2001, the time at which the parole board set his reconsideration date for 2007 instead of within three years. *Id.* The Eleventh Circuit was unpersuaded by this argument. *See id.* Importantly for purposes of the case at bar, the *Brown* court reasoned that Brown's only injury occurred in 1995, when the parole board applied the new policy retroactively.[10] *Id.* This reasoning comports with the principle relied upon in *Chardon*: Where a claimant alleges that a policy or action is unconstitutional,

---

[10]  Neelley seizes upon the Eleventh Circuit's use of the word "applied" in stating the holding of *Brown*, arguing that this should be read to mean that her injury did not occur until such time as the Parole Board applied the Act to deem her ineligible for parole. *See Brown*, 335 F.3d at 1261 ("Rather, Brown's injury, to the extent it ever existed, was when the Georgia Parole Board *applied* its new policy, eliminating the requirement of parole every three years for Brown, retroactively.") (emphasis added). The Eleventh Circuit's ultimate resolution of *Brown*, however, does not support this narrow reading of the word "applied."

*Brown* stands for the proposition that an inmate affected by a retroactive parole policy cannot be considered to have suffered multiple injuries each time the parole board makes a decision based on that policy. *See id.* That is, the inmate suffers an injury on the date a parole policy is applied retroactively, and not on any subsequent date on which the policy is followed in relation to the inmate's parole eligibility. *Id.* Applying this reasoning to the circumstances at bar, it is clear that Neelley suffered injury at the time the Act took effect. This is because the Act applied retroactively, and thus affected Neelley's rights pertaining to her 1999 commutation, on the date it became effective. She did not suffer a new injury on the date that she received a Parole Board notification indicating that she was ineligible for parole. She suffered injury on September 1, 2003, when the retroactive Act became law.

his injury is deemed to have occurred at the time the policy was adopted or the official action was taken. *Chardon*, 454 U.S. at 8. His injury does not occur, nor can he be deemed to have suffered a separate injury, when he feels the painful consequences of that policy or official action. *Id.*; *Brown*, 335 F.3d at 1261–62 ("It is the decision in 1995 that forms a potential basis for Brown's claim.").

In light of the reasoning of *Chardon* and *Brown*, it is evident that Neelley suffered injury at the time of the Act's adoption. Though the Parole Board would not eliminate the administrative record of her parole consideration date for another eleven years, it was in 2003 that the legislature took action affecting her constitutional rights. The painful consequences of the Act took hold in 2014, but this interval from the 2003 adoption to the 2014 parole denial is immaterial for purposes of determining when Neelley suffered an alleged injury. On this record, there is no genuine dispute of material fact regarding the Act's 2003 effective date. Accordingly, for purposes of resolving the timeliness issue, Neelley's injury occurred on September 1, 2003.

This conclusion is bolstered by the nature of the constitutional provision at issue. The relevant portion of Article I provides that "[n]o State shall . . . *pass* any Bill of Attainder[] [or] ex post facto Law." U.S. Const. art. I, § 10, cl. 1 (emphasis added). It is the passage of the alleged bill of attainder or *ex post facto* law that forms the basis of Neelley's challenge. *See Smith*, 149 F.3d at 1154. The claimant

in *Smith* challenged a statute on the basis of the contracts clause, which also prevents the passage of certain laws. *Id.* The *Smith* court focused on the nature of that constitutional provision, holding that the claimant's injury, for accrual purposes, arose at the time the challenged statute took effect—not at the time the claimant suffered from the act's negative consequences. *Id.* ("[T]he very essence of [a contracts clause claim] is a substantial impairment of plaintiff's contractual relationship with the state *by a change in law*.") (emphasis in original). *See also Lawshe v. Simpson*, 16 F.3d 1475, 1479 (7th Cir. 1994) (emphasizing the importance of measuring the statute of limitations injury analysis against the relevant constitutional provision). Focusing on the "essence" of her bill of attainder and *ex post facto* claims, as evidenced by the relevant constitutional language, it is clear that Neelley's injury occurred at the time the Act took effect. *Smith*, 149 F.3d at 1154; *Lawshe*, 16 F.3d at 1479.

Neelley also cites *Hope for Families & Comm. Serv., Inc. v. Warren* in support of her argument that she did not suffer injury, and thus her action did not accrue, until she received final notice on 2014 that she was barred from parole. *See* No. 3:06-cv-1113, 2008 WL 630469, at *5–6 (M.D. Ala. Mar. 5, 2008). In that case, the court found that the plaintiffs' § 1983 claim did not accrue at the time the state promulgated the challenged regulations. *Id.* at 6. Rather, the court found that the plaintiffs' cause of action accrued when the plaintiffs learned of an alleged

unlawful conspiracy that resulted in the promulgation of the challenged regulations. *Id.  Hope for Families* is distinguishable in three respects.

First, *Hope for Families* was before the court on a motion to dismiss, at which time the court was not considering evidence in the record regarding when the plaintiffs actually learned of the allegedly unconstitutional scheme being challenged. *Id.* Rather, on the occasion of that motion to dismiss, the court was merely reviewing the plaintiffs' allegations to determine their sufficiency under Rule 8 of the Federal Rules of Civil Procedure. *Id.* The plaintiffs in *Hope for Families* alleged that they were unaware of the defendants' unlawful activities until long after the promulgations of the regulations. *Id.* Here, in contrast, the record is replete with evidence suggesting that Neelley was aware of the Act's effect on her parole eligibility long before the Parole Board took action pursuant to the Act. *See* Part IV.B.2, *infra*.

Second, the constitutional provision at issue in *Hope for Families* was the equal protection clause of the Fourteenth Amendment.  2008 WL 630469, at *5–6. The language of that constitutional provision differs in significant respects from the language of the bill of attainder and *ex post facto* clauses forming the basis of Neelley's § 1983 claims.  *Compare* U.S. Const. amend. XIV, § 1 *with* U.S. Const. art. I, § 10, cl. 1.  Whereas the equal protection clause provides that no state shall *deny* any person equal protection of the laws, the bill of attainder and *ex post facto*

clauses proscribe the *passage* of certain legislative acts.  U.S. Const. amend. XIV, § 1; U.S. Const. art. I, § 10, cl. 1.  Under the reasoning of *Smith*, the constitutional provision at issue informs the injury prong of the accrual analysis.  149 F.3d at 1154.  The constitutional injury, for purposes of accrual of an equal protection claim, occurs at the time the governmental entity denies an application for a license pursuant to an unconstitutional law.  *See id.*; U.S. Const. amend. XIV, § 1; *Hope for Families*, 2008 WL 630469, at *5–6.  In the context of bill of attainder and *ex post facto* challenges, however, the constitutional injury coincides with the passage of the challenged act.  *See Smith*, 149 F.3d at 1154; U.S. Const., art. I, § 10, cl. 1.

Third, the factual circumstances under which the *Hope for Families* plaintiffs brought suit are materially different from those giving rise Neelley's claims.  In *Hope for Families*, some of the claimant entities were not even in existence at the time the state promulgated the challenged regulations.  In addition to the existential distinction, *Hope for Families* differs in that the plaintiffs in that matter had no means of discovering the alleged unlawful conduct until long after the promulgation of the challenged regulations.  *See* 2008 WL 630469, at *6. Neelley, on the other hand, admits that she was aware of the Act and its allegedly unconstitutional effect on her parole eligibility not long after its passage.  Neelley had already been convicted and was incarcerated at the time the Act became law.

22

She acknowledges that she was aware of the alleged unlawful conduct—the passage of the Act—well before the Parole Board's 2014 notice.

Based on the foregoing, for purposes of resolving the accrual inquiry, Neelley's injury occurred at the time the Act became effective. Attention turns now to the time at which Neelley discovered her injury.

### 2.    *When Neelley Could Have Initiated her Action*

That Neelley's injury occurred with the passage of the Act is not dispositive of the accrual inquiry. After determining what constitutes injury, courts must ascertain the time at which the plaintiff was aware that she could bring an action to rectify that injury. *Rozar*, 85 F.3d at 562. The parties have offered substantial evidence pertaining to this aspect of the accrual analysis. As discussed in more detail below, there is no genuine dispute of material fact regarding Neelley's awareness of her cause of action. Defendants are ultimately entitled to judgment as a matter of law.

Several aspects of the record demonstrate that Neelley was aware of the facts supporting her cause of action prior to April 10, 2012. First, Neelley admits that she had heard and read about the Act shortly after its passage in 2003. She also acknowledges that, at the time she heard and read about the Act, she believed that it could not be constitutionally applied to her. Second, Deese informed Neelley in 2004 that the Act might affect her parole. Deese also encouraged

Neelley to seek the advice of legal counsel regarding the Act's potential effect. Third, McPhillips informed Neelley of her potential constitutional claim by letter in both 2006 and 2009.[11]  Indeed, McPhillips *urged* Neelley in 2006 to get counsel "as soon as possible."   (2006 McPhillips Letter, Doc. # 42-11, at 1.)   This evidence, which is undisputed, is sufficient to demonstrate, as a matter of law, that Neelley's § 1983 claim accrued prior to April 10, 2012.   *See Mullinax v. McElhenney*, 817 F.2d 711, 716 (11th Cir. 1987) ("[W]hen a Section 1983 action accrues is a question of federal law.").   She knew of the facts supporting her potential cause of action, and thus her claim accrued, no later than 2009.  *See id.*

In response to this evidence, Neelley maintains that the notice she received was inadequate to trigger the running of the limitations period.  More specifically, she argues that the limitations period did not begin to run until 2014, at which time the Parole Board sent her official notice that she was barred from parole.  (See Doc. # 59, at 20–22.)   This position, however, is unsupported by the relevant authority.  It is true, as Neelley contends, that the action does not accrue until the plaintiff has some notice of her injury.  *See Brown*, 335 F.3d at 1261; *Smith*, 149

---

[11] In his letters, McPhillips mentioned the potential for an *ex post facto* claim, but not the potential for a bill of attainder claim.  The fact that he mentioned the potential generally for a constitutional claim is sufficient to put Neelley on notice of her cause of action.  She need not have been aware of all her potential theories of relief—it is enough that she was aware that she had been injured in a way that could be rectified by legal process.  *See United States v. Kubrick*, 444 U.S. 111, 122 (1979) ("We are unconvinced that for statute of limitations purposes a plaintiff's ignorance of his legal rights and his ignorance of the fact of his injury or its cause should receive identical treatment.").

F.3d at 1154. But none of the authority on which Neelley relies holds that the plaintiff must receive official government notice before she can be deemed aware of the facts supporting her cause of action.[12] Though the plaintiffs in *Brown* and *Smith* received official government notice that the challenged policy applied to them in a negative manner, neither of these cases turned on the official nature of the notice they received. Instead, the outcomes of those cases emanated from the general accrual principle that the statute of limitations begins to run at the time that "the facts which would support a cause of action are apparent or should be apparent to a person with reasonably prudent regard for his rights." *Rozar*, 85 F.3d at 561–62.

Neelley brought forth some evidence in response to Defendants' motion for summary judgment, but none of it is sufficient to indicate the existence of any genuine dispute of material fact. She principally relies on the notices she received from the Parole Board,[13] which indicated that her initial parole consideration date

---

[12] Neelley cited two other Tenth Circuit cases in support of her argument that her cause of action did not accrue until she received official notice that she was barred from parole. *See Jackson v. Standifird*, 463 F. App'x 736, 738 (10th Cir. 2012); *Wood v. Utah Bd. of Pardons & Paroles*, 375 F. App'x 871, 873–74 (10th Cir. 2010). Leaving aside the issue that neither of these cases is controlling, a brief review of the reasoning in each reveals that neither decision turned on the official nature of the notice the plaintiffs received. *See Jackson*, 463 F. App'x at 738; *Wood*, 375 F. App'x at 873–74. Instead, both of these cases relied on the more general principle that the action accrues at the time the plaintiff knows or should know of the facts supporting a cause of action. *See Jackson*, 463 F. App'x at 738; *Wood*, 375 F. App'x at 873–74.

[13] Some of these notices came by way of what appears to be a computer-generated mailing. Others came to Neelley by way of letters addressed specifically to her counsel. For the sake of convenience, all of this correspondence will be referred to generally as "the notices."

remained scheduled for January of 2014.  Neelley received these notices in 1999, 2001, 2010, and 2012.  Importantly, none of these notices indicated that Neelley was in fact eligible for parole in 2014.  They merely indicated, for Parole Board docketing purposes, the earliest date upon which she could be considered for parole eligibility.  The Parole Board's Operating Rules clarified that the scheduling of an initial consideration date was not a presumptive parole date.  The Parole Board also determined at a 2009 meeting that, although it understood that Neelley was not legally eligible for parole, it would not take official action to adjust her initial parole consideration date.  The notices Neelley received regarding the docketing of her initial parole consideration date do not rebut the evidence showing that she was aware of the facts supporting her § 1983 claim.  They merely show that the Parole Board maintained a 2014 initial consideration date for scheduling purposes.  There is no genuine dispute of material fact regarding Neelley's knowledge of the facts supporting her claim prior to April 20, 2012.

Based on foregoing analysis, Neelley's action is barred by the statute of limitations.  There is no genuine dispute of material fact regarding the nature of Neelley's injury or the time at which she was aware of the facts giving rise to her cause of action.  Defendants have submitted evidence indicating that Neelley was aware of the facts supporting her § 1983 claims prior to April 10, 2012.  Neelley has not come forward with evidence rebutting Defendants' evidence on this point.

In light of the evidentiary submissions and the controlling law, it is evident that Neelley's action accrued more than two years before she brought the instant action.

## C.   Whether Equitable Tolling Is Appropriate

In a final effort to revive her untimely suit, Neelley contends that the statute of limitations is subject to equitable tolling.  This equitable remedy, which allows the court to toll the running of the statute of limitations to avoid unjust consequences, should only be employed in extraordinary circumstances.  *Arce v. Garcia*, 434 F.3d 1254, 1261 (11th Cir. 2006).  To be entitled to this unusual benefit, Neelley must show (1) that she has diligently pursued her rights and (2) that some extraordinary circumstance prevented her from pursuing this claim.  *See Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005).  For the following reasons, Neelley fails to show that she is entitled to equitable tolling.

First, Neelley has not shown that she diligently pursued her rights with respect to this claim.  She has been aware of the Act since 2003, admitting that she assumed it was unconstitutional.  An attorney notified her as early as 2006 that she may have an ex post facto claim, but she did not bring this action until 2014.  One who diligently pursues her rights would, at the very least, make an effort to consult legal counsel regarding the viability of such a claim.  Had she been diligently pursuing her rights, she would have taken a course of action similar to the one she took in Montgomery County Circuit Court regarding the applicability of Ala. Code

§ 15-22-27(b) (1975).   Immediately upon learning of the Act's potential constitutional infirmities, she should have initiated an action seeking a declaration of her rights.   Instead of taking action, she slumbered on her rights.   And equity aids only the vigilant.

Second, Neelley has not established that any extraordinary circumstances prevented her from initiating this action in the intervening years between 2003 and 2014.   The fact that she received *pro forma* notices regarding her 2014 initial parole consideration date does not indicate that she faced some insurmountable hurdle in taking action to protect her constitutional rights.   If anything, these notices should have spurred Neelley to action.   Though the notices may have indicated that she was scheduled for "parole consideration," she also was aware that, at the time she came due for such parole consideration, the Act likely foreclosed the relief for which she was to be considered.   The notices, regardless of the information they transmitted, did not prevent Neelley from filing a § 1983 complaint seeking a declaration of rights.

Because Neelley has failed to show that she is entitled to equitable relief under these circumstances, the statute of limitations will not abate under the doctrine of equitable tolling.   As a result, Neelley's action is procedurally barred.   The undisputed evidence establishes that Neelley was aware of the facts supporting her cause of action in 2009, if not earlier.   Because she waited until 2014 to initiate

this case, she may not go forward with her claims.  There is no genuine dispute of material fact with respect to the accrual of Neelley's action, and Defendants are entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.

## V.  CONCLUSION

Accordingly, it is ORDERED that Defendants' Motion for Summary Judgment (Doc. # 42) is granted.

A separate final judgment will be entered.

DONE this 25th day of March, 2016.

/s/ W. Keith Watkins
CHIEF UNITED STATES DISTRICT JUDGE