IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JUDITH A. NEELLEY,               )
                                 )
          Plaintiff,             )
                                 )
     v.                          )     CASE NO. 2:14-CV-269-WKW
                                 )              [WO]
CLIFFORD WALKER, *et al.*,        )
                                 )
          Defendants.            )

## MEMORANDUM OPINION AND ORDER

Plaintiff Judith A. Neelley was originally sentenced to death, but Alabama Governor Fob James commuted her sentence to life imprisonment with the possibility of parole. A few years later, the Alabama Legislature made a class of its inmates ineligible for parole. That class consists of exactly one inmate.

Ms. Neelley.

According to Ms. Neelley, that change in Alabama law violated both the ban on bills of attainder and the ban on *ex post facto* laws in Article I, Section 10 of the U.S. Constitution. She brings this action under 42 U.S.C. § 1983 against Defendants Clifford Walker, Lyn Head, and Terry G. Davis in their official capacities as members of the Alabama Board of Pardons and Paroles. Her claims are now before the court on cross-motions for summary judgment (Docs. # 80, 81) based on

stipulated facts (Doc. # 77, at 2–11).  Those motions have been fully briefed.  (Docs. # 81, 84, 85, 88, 89.)

The Alabama law at issue here retroactively enhanced the punishment of only Ms. Neelley, so it is both an unconstitutional bill of attainder and an unconstitutional *ex post facto* law.  Therefore, Ms. Neelley's motion for summary judgment (Doc. # 80) is due to be granted, and Defendants' second motion for summary judgment (Doc. # 81) is due to be denied.

## I.  JURISDICTION AND VENUE

Subject-matter jurisdiction is exercised pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).  The parties do not contest personal jurisdiction or venue.

## II.  STANDARD OF REVIEW

To succeed on a motion for summary judgment, the moving party must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court views the evidence, and all reasonable inferences drawn from it, in the light most favorable to the nonmoving party.  *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion . . . ."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This responsibility includes identifying the

portions of the record illustrating the absence of a genuine dispute of material fact. *Id.* Alternatively, a movant who does not have a trial burden of production can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact. Fed. R. Civ. P. 56(c)(1)(B).

If the movant meets its burden, the burden shifts to the nonmoving party to establish — with evidence beyond the pleadings — that a genuine dispute material to each of its claims for relief exists. *Celotex Corp.*, 477 U.S. at 324. A genuine dispute of material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

"Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *Bricklayers, Masons & Plasterers Int'l Union of Am., Local Union No. 15 v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir. 1975).[1] "Nonetheless, cross-motions may be probative of the non-existence of a factual dispute when, as here, they demonstrate a basic agreement concerning what legal theories and material facts are dispositive." *Id.* "'[W]hen both parties proceed on the same legal theor[ies] and rely on the same material

---

[1] The Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981).

facts[,] the court is signaled that the case is ripe for summary judgment." *Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983). But "before the court can consider the legal issues raised by the parties on cross-motions for summary judgment, it must have no doubt as to the relevant facts that are beyond dispute." *Griffis v. Delta Family-Care Disability*, 723 F.2d 822, 824 (11th Cir. 1984).

## III. BACKGROUND

The parties have stipulated to all of the material facts in this case. (Doc. # 77, at 2–11.)

Ms. Neelley was convicted of capital murder in 1983 for murdering Lisa Ann Millican. The trial judge described Ms. Neelley's crime in great detail in his sentencing order:

> The body of Lisa Ann Millican, age 13, was found in a gorge known as Little River Canyon near Fort Payne on September 29, 1982. Lisa was a resident of the Ethel Harpst Home, a Methodist home for neglected children located in Cedartown, Georgia.
>
> Lisa and five other girls from the home were taken by a house parent on an outing to Riverbend Mall in Rome, Georgia on September 25, 1982. While at the mall, Lisa became separated from the others. During this separation, she was abducted by [Ms. Neelley], who asked Lisa to go "riding around." Lisa hesitated at first, but then agreed. The events which followed the abduction led to the death of Lisa when [Ms. Neelley] shot her in the back on September 28, 1982, and threw her body into the canyon.
>
> The abduction of Lisa Ann Millican was part of a bizarre scheme whereby [Ms. Neelley] attempted to lure girls and young women into the car with her for the ultimate purpose of making them available to her husband, Alvin Neelley, for sex with him. For several days immediately prior to Lisa's abduction, [Ms. Neelley] and Alvin drove up and down Rome streets in separate automobiles looking for girls

who would be suitable. When Alvin would see one who appealed to him, he would communicate with [Ms. Neelley] by C–B radio, and [Ms. Neelley] would invite the girl to go riding around with her. Numerous girls refused [Ms. Neelley's] invitation; her first successful pick-up was Lisa Ann Millican.

[Ms. Neelley] took Lisa to a motel in Franklin, Georgia where she tried to persuade Lisa to submit to sex with Alvin, but Lisa resisted. Finally, Alvin told Lisa that if she did not submit to sex, [Ms. Neelley] would kill her. Following this threat, Alvin engaged in sex with Lisa, and later that night, Lisa was handcuffed to the bed to prevent her escape.

The next day, [Ms. Neelley] and Alvin, traveling in two cars, took Lisa with them to Cleveland, Tennessee where they picked up their two-year-old twins who were being cared for by Alvin's mother. Later that day, they traveled to Scottsboro, Alabama where they rented a motel room. Shortly after their arrival at the motel, [Ms. Neelley] hit Lisa in the head several times with a slapjack in an attempt to render her unconscious, but she was unsuccessful in achieving that result. Alvin then had sex with Lisa, and afterward Lisa slept overnight on the floor, unclothed, and handcuffed to the bed.

The following day, Alvin had sex with Lisa twice more despite her cries and pleas that he stop. [Ms. Neelley] was present during these sexual encounters and at one point during the day, she handcuffed Lisa to the plumbing in the bathroom and interrogated her about a man she had appeared to know at a dairy bar near the motel.

The next morning, Lisa was taken to Little River Canyon by [Ms. Neelley] where [Ms. Neelley] instructed Lisa to lie face down and place her hands around a tree. [Ms. Neelley] then handcuffed Lisa's hands. She explained to Lisa that she was going to give her a shot that would make her fall asleep and that when she waked up, Lisa would be free to go. Using a needle and syringe, [Ms. Neelley] injected Lisa in the neck with liquid drain cleaner. When Lisa did not die in five minutes, [Ms. Neelley] injected her again in the neck. She injected Lisa four additional times, twice in the arms and twice in the buttocks, waiting about five minutes after each injection for Lisa to die. Twice during the infliction of these injections, Lisa requested to get up and "use the bathroom" in the woods. She was allowed to do so, and each time she returned and resumed her position on the ground with her hands around the tree.

Following the last injection, [Ms. Neelley] instructed Lisa to walk around for awhile to hasten the work of the poison in her body. When it finally appeared that Lisa was not going to die from the drain cleaner, [Ms. Neelley] marched Lisa to the rim of the canyon to shoot her in the back in a manner that would cause her body to fall into the canyon. Lisa begged to go back to the Harpst Home and promised not to tell what had happened. [Ms. Neelley] told Lisa to be quiet and then shot her in the back. Lisa fell backward toward [Ms. Neelley] instead of falling into the canyon. [Ms. Neelley] picked up the body and, using her knee, propelled it into the canyon.

During [Ms. Neelley's] trial testimony, she testified that Alvin was present at the canyon directing her every action. However, in an out-of-court statement made shortly after her arrest, [Ms. Neelley] stated that Alvin was not present at the canyon.

Five days after the death of Lisa Ann Millican, [Ms. Neelley] picked up a young woman named Janice Chapman and her common-law husband, John Hancock, from a street in Rome. Later that night, [Ms. Neelley] shot John Hancock in the back and left him for dead. He survived, however, and was present at the trial to testify to the incident.

[Ms. Neelley] and Alvin took Janice Chapman to a motel in Rome where Alvin engaged in sex with Janice. The next day, [Ms. Neelley] killed Janice Chapman, shooting her once in the back and twice in the chest. During [Ms. Neelley's] trial testimony, she testified that Alvin was present during the shooting of John Hancock and Janice Chapman and that he directed her to shoot them; however, in her out-of-court statement given shortly after her arrest, she stated that Alvin was present when she shot John Hancock but that he was not present when she killed Janice Chapman.

On October 9, 1982, the day before [Ms. Neelley's] arrest, she picked up another young woman in Nashville, Tennessee who was present with [Ms. Neelley] and Alvin in a motel room in Murfreesboro, Tennessee on October 10, 1982 when [Ms. Neelley] was arrested on a bad check charge. Later, this woman was released by Alvin unharmed.

Alvin was arrested in Murfreesboro on October 13, 1982, also on a bad check charge. While [Ms. Neelley] and Alvin were in custody on the bad check charges, additional charges were placed against them arising from the murders of Lisa Ann Millican and Janice Chapman, and the shooting of John Hancock.

*Neelley v. State*, 494 So. 2d 669 app. III 690–91 (Ala. Crim. App. 1985) (including the trial judge's sentencing order in an appendix).

Although the jury recommended (by a margin of ten to two) that she be sentenced to life without the possibility of parole, the trial judge sentenced Ms. Neelley to death. She exhausted all of her state and federal judicial means of challenging her sentence to no avail.

On January 15, 1999, his last day in office, Governor James commuted Ms. Neelley's death sentence to "life imprisonment." (Doc. # 77, at 7.) The Alabama Board of Pardons and Paroles requested an official opinion from Alabama Attorney General Bill Pryor clarifying the effect of that commutation. His opinion advised the Board that Governor James had effectively commuted Ms. Neelley's death sentence to life imprisonment with the possibility of parole. Even though a death sentence and a sentence of life imprisonment without the possibility for parole were the only sentences a court could impose for capital murder under Alabama law at the time of Ms. Neelley's crime, conviction, and sentencing, the Alabama Constitution gave the governor the authority to commute a death sentence to a sentence less than life without the possibility of parole. And per statute at the time Governor James commuted Ms. Neelley's death sentence, "[a]ny person whose sentence to death has been commuted by the Governor to life imprisonment" would be eligible for parole consideration after serving "at least [fifteen] years of such life sentence." Ala. Code

§ 15-22-27(b) (1975). The net effect of the commutation, Attorney General Pryor concluded, was that Ms. Neelley would be eligible for parole consideration fifteen years after Governor James commuted her sentence.

Pursuant to that opinion, the Board notified Ms. Neelley on March 8, 1999, that she would be eligible for parole consideration in January of 2014. She requested a parole hearing in October of 2001, but the Board denied that request and reiterated its position that she would not be eligible for parole consideration until January of 2014. Shortly after that denial, Ms. Neelley filed an action in state court seeking a judicial declaration that she was eligible for parole consideration because she had already served over sixteen years on death row. The court denied her the relief she sought, finding that she would be eligible for parole consideration only after serving fifteen years of her commuted sentence.

In 2003, just over four years after Governor James commuted Ms. Neelley's death sentence, the Alabama legislature passed and Governor Bob Riley signed Act 2003-300. The Act amended Alabama Code Section 15-22-27(b) to read as follows, in relevant part: "Any person whose sentence to death has been commuted by the Governor shall not be eligible for a parole." That change was made retroactive to September 1, 1998 — four months before Governor James commuted Ms. Neelley's sentence.

Ms. Neelley is the only person whose death sentence was commuted between September 1, 1998, and the Act's passage in 2004. In fact, "[a]s of July 10, 2015, Judith Ann Neelley is the first and only inmate to have had a death sentence commuted by an Alabama Governor since July 24, 1962." (Doc. # 77, at 10 (quoting Doc. # 42-2).)

In January of 2014, the Board requested a formal opinion from Alabama Attorney General Luther Strange on whether Ms. Neelley was eligible for parole consideration in light of Act 2003-300. Attorney General Strange concluded that she was not. On April 1, 2014, just over fifteen years after Governor James had commuted Ms. Neelley's sentence, the Alabama Board of Pardons and Paroles informed Ms. Neelley that she was not eligible for parole consideration.

## IV. PROCEDURAL HISTORY

### A.   <u>Plaintiff files and subsequently amends her complaint.</u>

Plaintiff initiated this action on April 10, 2014, claiming that Act 2003-300 violated both the Bill of Attainder and *Ex Post Facto* Clauses of Article I, Section 10 of the U.S. Constitution, as well as certain provisions of the Alabama Constitution. (Doc. # 1.) The original complaint named the Board, as opposed to its individual members, as the defendant. The Board moved to dismiss the complaint (Doc. # 11), and Ms. Neelley filed an amended complaint replacing the Board with

the Board's members as Defendants (Doc. # 13).[2]  The court later denied the motion to dismiss the original complaint as moot.  (Doc. # 16.)

**B.** **The court grants Defendants' Motion to Dismiss in part and denies it in part.**

The current Defendants, Clifford Walker, Lyn Head, and Terry G. Davis, moved to dismiss Ms. Neelley's amended complaint.  (Doc. # 18.)  The court granted the motion with respect to Ms. Neelley's state-law claims but denied it with respect to her federal claims.  (Doc. # 22.)  For the former, the court held that it lacked subject-matter jurisdiction to order state agents to follow state law.  For the latter, the court rejected Defendants' statute-of-limitations defenses because the allegations in Ms. Neelley's amended complaint did not indicate that she had the requisite knowledge of the constitutional violations she alleges early enough for the statute of limitations to have run.

The court further found that Ms. Neelley sufficiently alleged that Act 2003-300 violated the *Ex Post Facto* and Bill of Attainder Clauses of Article I, Section 10 of the U.S. Constitution to state claims upon which relief could be granted.

---

[2] Plaintiffs' Amended Complaint named Clifford Walker, William W. Wynne, Jr., and Robert P. Longshore as defendants in their official capacities as members of the Alabama Board of Pardons and Paroles.  Lyn Head and Terry G. Davis succeeded Messrs. Wynn and Longshore in those positions and, therefore, are each "automatically substituted as a party."  Fed. R. Civ. P. 25(d).

**1.** ***By alleging that Act 2003-300 retroactively eliminated her eligibility for parole consideration, Ms. Neelley stated a valid Ex Post Facto Clause claim.***

The court noted that Defendants did not contest that the Act was retroactive for *ex post facto* purposes. Instead, Defendants argued that the Act did not impermissibly increase Ms. Neelley's punishment because it was not punitive, nor did the Act increase the punishment annexed to capital murder at the time Ms. Neelley murdered Ms. Millican. The court rejected Defendants' first argument because they failed to provide any authority to support it. The court rejected their second argument because it was based on an overly restrictive reading of Justice Chase's non-exhaustive list of *ex post facto* laws in his opinion in *Calder v. Bull*, 3 U.S. (3 Dall.) 386 (1798), and failed to account for the "truly extraordinary situation of a legislative branch retroactively increasing a punishment declared by the executive branch in a commuted sentence." (Doc. # 22, at 18.) Moreover, the potential sentences for capital murder when Ms. Neelley committed that heinous crime were not legally relevant to the *ex post facto* analysis because Ms. Neelley "is serving a commuted sentence, and her commuted sentence is now the only legal sentence in the universe of possible, legal sentences for her crime." (Doc. # 22, at 18.)

"[T]he pertinent question," then, was "what terms of parole eligibility were annexed by Alabama law to a state defendant's commuted capital murder sentence."

(Doc. # 22, at 18–19.)  It was clear that under Alabama law at the time of Ms. Neelley's crime, conviction, sentencing, and commutation, individuals whose death sentences had been commuted to life imprisonment by the governor would be eligible for parole consideration after serving fifteen years of their commuted life sentences.  By eliminating this eligibility for parole consideration, Act 2003-300 retroactively imposed on Ms. Neelley the unquestionably harsher punishment of life without the possibility of parole.  Ms. Neelley's allegations to that effect thus stated a valid claim for relief under the *Ex Post Facto* Clause.

### 2. *By alleging that Act 2003-300 singled her out to retroactively increase the punishment for her crime, Ms. Neelley stated a valid Bill of Attainder Clause claim.*

The court found that Ms. Neelley's allegations sufficiently attributed each of the three hallmarks of a bill of attainder to Act 2003-300: (1) the infliction of punishment; (2) "a specific designation of persons or groups as subjects of the legislation" and (3) an "arbitrary deprivation" of individual rights "without notice, trial, or other hearing." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 538–39 (1977) (Burger, C.J., dissenting).  The court rejected Defendants' conclusory argument that the Act was not punitive as applied to Ms. Neelley, noting that the argument was likely baseless.  Defendants' arguments that the Act did not specifically designate Ms. Neelley fared no better, both because she alleged that the Act's sponsors made it clear that their intent was to increase her sentence and because the Legislature

suspiciously made the Act retroactive to four months prior to her January 1999 commutation. And the court found that Ms. Neelley sufficiently alleged that she was arbitrarily deprived of her right to seek parole consideration in 2014 without any opportunity to contest the deprivation to establish the third hallmark of a bill of attainder. In sum, Ms. Neelley had sufficiently stated a claim under the Bill of Attainder Clause, even if her case is unique.

The court thus allowed Ms. Neelley's federal constitutional claims to proceed.

## C. **The court grants Defendants' First Motion for Summary Judgment, but the Eleventh Circuit reverses.**

Defendants later filed a motion for summary judgment (Doc. # 41), which the court granted on statute-of-limitations grounds without addressing the merits of Ms. Neelley's *ex post facto* and bill of attainder claims (Doc. # 64). The court found that the relevant statute of limitations was two years and that Ms. Neelley had sufficient notice of the possibility that Act 2003-300 eliminated her eligibility for parole consideration — at which point her federal claims accrued — more than two years before she filed this action. The Eleventh Circuit reversed in an unpublished opinion. *Neelley v. Walker*, 677 F. App'x 532 (11th Cir. 2017) (per curiam). Because the Board told Ms. Neelley more than once after the Act's passage that she would be eligible for parole consideration in January of 2014, the panel held that Ms. Neelley's claims did not accrue until the Board told her in April of 2014 that she was ineligible for parole consideration under the Act.

**D.** **The parties file cross-motions for summary judgment.**

Following the Eleventh Circuit's reversal, the parties "agree[d] that this matter should be able to be resolved without the need for a trial and that this matter can potentially be resolved on cross motions for summary judgment and stipulated facts." (Doc. # 77, at 11.) Those motions (Docs. # 80, 81) and stipulated facts (Doc. # 77, at 2–11) are currently before the court.

## V. DISCUSSION

Per Section 10 of Article I of the Constitution, "No State shall . . . pass any Bill of Attainder . . . [or] ex post facto Law." U.S. Const. art. I, § 10, cl. 1. The court has already found that Ms. Neelley has stated viable claims that Act 2003-300, as applied to her, is an unconstitutional bill of attainder and *ex post facto* law. The court's analysis at that stage in the proceedings applies with similar force to the pending cross-motions for summary judgment. The main difference is that while the material facts had only been alleged at that earlier stage, the parties have since stipulated to them. Additionally, Defendants' briefing on the cross-motions for summary judgment has matured since their briefing in support of their motion to dismiss (*see* Doc. # 22, at 17 n.5). But though their present briefing may be more thorough this time around, it is no more persuasive. Defendants' second motion for summary judgment (Doc. # 81) is therefore due to be denied, and Ms. Neelley's motion for summary judgment (Doc. # 79) is due to be granted.

**A.** **At least as applied to Ms. Neelley, Act 2003-300 is an unconstitutional *ex post facto* law.**

"To fall within the *ex post facto* prohibition, a law must be retrospective — that is, 'it must apply to events occurring before its enactment' — and it 'must disadvantage the offender affected by it' by altering the definition of criminal conduct or increasing the punishment for the crime." *Lynce v. Mathis*, 519 U.S. 433, 441 (1997) (quoting *Weaver v. Graham*, 450 U.S. 24, 29 (1981)).  The parties do not dispute that Act 2003-300 is retrospective as applied to Ms. Neelley, as the Act was passed after Ms. Neelley committed her crime, was convicted, sentenced to death, and had her death sentence commuted to life with the possibility of parole.

But Defendants argue that the Act does not punish Ms. Neelley and that, even if it is punitive, the act does not increase the punishment for Ms. Neelley's crime. Both arguments fail.

**1.** ***Regardless of whether Act 2003-300 was intended to fix a mistake on Governor James's part, the Act is punitive as applied to Ms. Neelley.***

Defendants first argue that the legislature lacked the requisite punitive intent to pass an *ex post facto* law when it passed Act 2003-300 because "it merely corrected the clerical mistake Governor James reportedly made when commuting Neelley's death sentence."  (Doc. # 81, at 10.)  Defendants suggest that Governor James meant to commute Ms. Neelley's sentence to life without the possibility of parole but inadvertently commuted her sentence to life with the possibility of parole.

It is unclear from the record whether Governor James in fact intended to commute Ms. Neelley's death sentence to life without the possibility of parole, but Defendants do not hang their argument on the truth of that proposition. What matters, they argue, is that "the Legislature at least could have believed it to be true . . . when it passed Act 2003-300." (Doc. # 81, at 10.) From there, Defendants jump to the conclusion that the legislature passed the Act to fix Governor James's presumed mistake, which Defendants call a "clerical mistake" (Doc. # 81, at 10, 13, 16, 26), a "clerical error" (Doc. # 81, at 11, 13, 15), and "scrivener's error" (Doc. # 81, at 15). And because the legislature intended only to correct what they perceived to be an error, Defendants conclude, the legislature did not intend to punish Ms. Neelley.

Governor James did indeed make a clerical or scrivener's error when he commuted Ms. Neelley's death sentence: He misspelled her name. (Doc. # 77, at 7 ("I hereby commute the sentence of Judith Ann *Neeley* [sic] to life imprisonment." (emphasis added)).) Of course, that is not the error on which Defendants focus, but it is the only clerical or scrivener's error in Governor James's commutation letter. Justice Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 439 ("defining a scrivener's error as "[a] drafter's or typist's technical error — such as transposing characters or omitting an obviously needed word — that can be rectified without serious doubt about the correct reading").

Even if Governor James's commutation of Ms. Neelley's death sentence to life with the possibility of parole instead of life without the possibility of parole was the result of some transcriptional error in his commutation letter (there is no admissible evidence in the record that it was), Defendant has failed to show that the legislature could subsequently correct such an error. The only authority Defendants have provided on the issue of correcting a clerical mistake is the Ninth Circuit's opinion in *United States v. Stauffer*, 922 F.2d 508 (9th Cir. 1990). There, the Ninth Circuit held that the district court did not violate the Double Jeopardy Clause of the Fifth Amendment when it corrected a verdict form to reflect the verdict the jury intended. Defendants cite *Stauffer* for a rather general proposition: "If correcting clerical mistakes was embedded in our history and traditions as punishment, then the Ninth Circuit would have decided *Stauffer* differently." (Doc. # 81, at 16.)

To paraphrase Defendants' brief only slightly, *Stauffer* shows that correcting clerical errors does not necessarily violate the Constitution. True enough, but that does not prove that a legislature has the power to correct a governor's alleged clerical error in such a way as to retroactively increase an individual's punishment. Indeed, *Stauffer* did not raise the separation-of-powers concerns at issue here. The clerical error in *Stauffer* was made and corrected by the same branch of government. In this case, on the other hand, the alleged clerical error was made by the executive branch and corrected by the legislative branch. The *Ex Post Facto* Clause prohibits such

legislative overreach. *See Weaver*, 450 U.S. at 29 n.10 ("The *ex post facto* prohibition also upholds the separation of powers by confining the legislature to penal decisions with prospective effect and the judiciary and executive to applications of existing penal law."). Moreover, the correction in *Stauffer* was authorized by Rule 36 of the Federal Rules of Criminal Procedure. *See Stauffer*, 922 F.3d at 514. That rule empowers U.S. district courts in the context of federal criminal proceedings to "correct a clerical error in a judgment, order, or other part of the record, or correct an error in the record arising from oversight or omission." Fed. R. Crim. P. 36. Defendants have pointed to no analogous authority that empowers a state legislature to correct an alleged clerical error in a commutation letter, a letter containing a constitutionally authorized commutation of sentence that is not subject to legislative meddling.

But focusing on the legislature's purported intent to correct Governor James's alleged clerical error ignores the fact that correcting such an error would inherently impose greater punishment on Ms. Neelley. It is undisputed that the effect of Governor James's commutation letter was to commute Ms. Neelley's death sentence to life with the possibility of parole. It is also undisputed that the Act increased her punishment to life without the possibility of parole. Defendants do not argue that life without the possibility of parole is not a greater punishment than life with the possibility of parole. Nor could they. *See Warden, Lewisburg Penitentiary v.*

*Marrero*, 417 U.S. 653, 662–63 (1974) (dictum) ("[O]nly an unusual prisoner could be expected to think that he was not suffering a penalty when he was denied eligibility for parole. . . . 'It may be "legislative grace" for Congress to provide parole but when it expressly removes all hope of parole upon conviction and sentence for certain offences, . . . this is in the nature of an additional penalty.'" (second omission in original) (citations omitted)).

There are certainly cases in which an in-depth analysis of legislative intent is necessary to determine whether a legislative action is punitive. *E.g.*, *Kansas v. Hendricks*, 521 U.S. 346 (1997); *Flemming v. Nestor*, 363 U.S. 603 (1960). This is not one of those cases. Act 2003-300 punishes Ms. Neelley for the purposes of the *Ex Post Facto* Clause.

> **2.** ***Act 2003-300 increased Ms. Neelley's punishment in violation of the* Ex Post Facto *Clause even though her resulting punishment was one of the punishments Alabama law annexed to capital murder at the time of Ms. Neelley's crime.***

Although they concede that the Act imposed a harsher punishment on Ms. Neelley than the punishment that resulted from Governor James's commutation, Defendants argue that the Act did not increase her punishment in the relevant sense. That argument rests on Defendants' reading of Justice Chase's opinion in *Calder v. Bull*, 3 U.S. (3 Dall.) 386 (1798). Justice Chase famously listed the four main categories into which most *ex post facto* laws fall, the third of which is relevant here: "Every law that changes the *punishment*, and *inflicts a greater punishment, than the*

*law annexed to the crime*, when committed." *Id.* at 390 (opinion of Chase, J.) (emphasis added). Defendants draw a distinction between the punishment available for a crime and the punishment imposed on a particular individual convicted of that crime. Only the former, they argue, is covered by the *Ex Post Facto* Clause. Defendants contend that the Act did not change the former because the only punishments by Alabama law annexed to capital murder at the time of Ms. Neelley's crime, conviction, and sentence were death and life without the possibility of parole. Therefore, they conclude, the Act did not violate the *Ex Post Facto* Clause.

Defendants' arguments prove too much. Under Defendants' logic, the Alabama legislature would arguably have the power to impose a death sentence retroactively on anyone convicted of capital murder in Alabama sentenced to life without the possibility of parole. After all, death is one of the possible sentences Alabama law provides for capital murder, so such a law would merely inflict a punishment the law already annexed to capital murder. Defendants do not take their logic to that conclusion, instead contenting themselves with an assertion of the authority to enhance Ms. Neelley's punishment to life without the possibility of parole retroactively.

Not only is the logical conclusion of Defendants' argument problematic, but Defendants' argument also rests on a faulty premise: that a punishment less than life

without the possibility of parole was not annexed to the crime of capital murder under Alabama law.

Before Act 2003-300 was passed, the Alabama Constitution allowed the governor to commute a death sentence to life with the possibility of parole. Alabama law explicitly contemplated this contingency, as it provided that an inmate whose death sentence had been commuted to life with the possibility for parole would be eligible for parole consideration after serving fifteen years of that lesser sentence. So while Alabama law provided two potential *sentences* for capital murder at the time Ms. Neelley committed her crime, Alabama law provided at least three potential *punishments* for capital murder. The potential *sentences* were (1) a death sentence and (2) a sentence of life without the possibility of parole. The potential *punishments* were (1) death; and (2) life without the possibility of parole; or (3) a punishment less than life without the possibility of parole — including, as relevant here, life with the possibility of parole — as a result of a commutation by the governor. Act 2003-300 deliberately attempted to eliminate the third of these options, the one embedded in the Alabama Constitution, and it did so retroactively.[3] Admittedly, the possibility that someone convicted of capital murder in Alabama would have a resulting death

---

[3] Act 2003-300 may very well violate the Alabama Constitution in that it tries to limit — by statute — the governor's constitutional authority to commute death sentences to any sentence less than death, a limitation that would seem to require a constitutional amendment. But that question is not before the court.

sentence commuted by an Alabama governor — let alone that a death sentence would be commuted to something less than life without the possibility of parole — seems remote at best.  But Ms. Neelley is living proof that it was still a possibility before the Act.

The Third Circuit found an *ex post facto* violation in similar circumstances when it decided *Mickens-Thomas v. Vaughn*, 321 F.3d 374 (3d Cir. 2003).  Louis Mickens-Thomas had been sentenced to life imprisonment, a sentence that "presumptively exclude[d] any possibility of parole" under Pennsylvania law.  *Id.* at 377.  That presumption could be overcome only by a commutation to a sentence that included a possibility of parole, and Mr. Thomas's sentence was so commuted.  *Id.* Pennsylvania law provided that, "[f]ollowing a commutation, a prisoner seeking to be released must still submit to the same parole procedures applicable to all other prisoners."  *Id.*  Those procedures changed after Mr. Thomas's sentence was commuted but before he was first eligible for parole consideration.  *See id.*  When he was denied parole under the new procedures, he challenged their application to him as a violation of the *Ex Post Facto* Clause of Article I, Section 10 of the U.S. Constitution.  *Mickens-Thomas*, 321 F.3d at 380–83.

The Third Circuit held that applying the new procedures did in fact violate the *Ex Post Facto* Clause.  The court explained its conclusion as follows:

> [T]he parole change substantially impacted Thomas in violation of the Ex Post Facto clause.  Moreover, Thomas is entitled to the benefits of

his good behavior in prison; the opportunity to reduce his sentence through commutation, no matter how speculative, existed at the time of Thomas's crime. Thomas successfully attained a commutation of his sentence; he was entitled to corresponding reduction in sentence. We, therefore, hold that to retroactively apply changes in the parole laws made after conviction for a life sentence in Pennsylvania that adversely affect the release of prisoners whose sentences have been commuted, violates the Ex Post Facto clause.

*Id.* at 393. Admittedly, Mr. Thomas's chances of being able to reduce his sentence through commutation were much greater than Ms. Neelley's chances of reducing her sentence. Indeed, Thomas was one of hundreds of prisoners whose sentences of life without the possibility of parole had been commuted to a sentence that allowed for the possibility of parole, *id.* at 383, whereas Ms. Neelley is the only person whose death sentence was commuted to life with the possibility of parole from 1962 until at least 2015 (probably until this day, although the parties have not stipulated to that).

But Act 2003-300's negative impact on Ms. Neelley's chances for parole was much greater than the impact Pennsylvania's changes to its parole procedures had on Mr. Thomas's chances for parole. While Mr. Thomas's chances of being paroled decreased to some degree, Ms. Neelley's chances of being paroled were eliminated entirely.

Consequently, the Third Circuit's reasoning still applies to Ms. Neelley. Act 2003-300 substantially impacted Ms. Neelley. The opportunity to reduce her sentence through commutation, no matter how speculative, existed at the time of Ms. Neelley's crime. Ms. Neelley successfully attained a commutation of her sentence;

she was entitled to a corresponding reduction in sentence. Therefore, to retroactively apply Act 2003-300's changes in the parole laws — changes made after Ms. Neelley's crime, conviction, sentencing, and commutation — that terminate her prospects for release on parole after her sentence was commuted, violates the *Ex Post Facto* Clause.

* * *

Defendants' attempt to place Act 2003-300's effect on Ms. Neelley's sentence outside the ambit of the *Ex Post Facto* Clause's protection thus fails. Therefore, with respect to her *ex post facto* claim, Ms. Neelley's motion for summary judgment (Doc. # 79) is due to be granted and Defendants' second motion for summary judgment (Doc. # 81) is due to be denied.

## B. As applied to Ms. Neelley, Act 2003-300 is an unconstitutional bill of attainder.

A law constitutes a bill of attainder if it "legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 468 (1967). A bill of attainder thus has three elements: (1) "specification of the affected persons," (2) "punishment," and (3) "lack of a judicial trial." *Selective Serv. Sys. v. Minn. Pub. Interest Research Grp.*, 468 U.S. 841, 847 (1984).

Act 2003-300 has all three of those elements. First, the Act unquestionably identifies Ms. Neelley and designates her as the subject of its retroactive application.

Admittedly, the Act does not specifically name her, and its retroactive application reaches before the date of her commutation. But the Act was not subtle in identifying Ms. Neelley. The Legislature suspiciously made the Act retroactive to four months before Ms. Neelley's commutation. And the retroactivity provision ensured that the Act would proximately affect one more person than it might have otherwise: Ms. Neelley. Indeed, the Act demonstrates that a legislature does not need to specifically name an individual to identify that person and designate that person as the subject of a piece of legislation. *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 324–25 (1866) ("The Constitution deals with substance, not shadows. Its inhibition was levelled at the thing, not the name. It intended that the rights of the citizen should be secure against deprivation for past conduct by legislative enactment, under any form, however disguised. If the inhibition can be evaded by the form of the enactment, its insertion in the fundamental law was a vain and futile proceeding." *Id.* at 325.).

Second, the Act constitutes punishment as applied to Ms. Neelley for the purposes of the Bill of Attainder Clause. The U.S. Supreme Court has "recognized three necessary inquiries" used to make this determination: "(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, 'viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes'; and (3) whether

the legislative record 'evinces a [legislative] intent to punish.'" *Selective Serv. Sys.*, 468 U.S. at 852 (quoting *Nixon*, 433 U.S. at 475–476, 478) (citing *Nixon*, 433 U.S. at 473). The first two inquiries lead to the conclusion that the Act is punitive for the reasons discussed in the previous section with respect to the *Ex Post Facto* Clause. *See supra* Section V.A.1. Defendants make no credible, reasonable argument that the Act furthers a non-punitive legislative purpose when it is applied to reality. And even assuming the third inquiry is still "necessary" in light of the judicial and academic critiques of the use of legislative history, that inquiry does not change the conclusion that the Act is punitive for the purposes of the Bill of Attainder Clause.

Third, the Act arbitrarily deprives Ms. Neelley of her eligibility for parole consideration without notice, trial, or any other procedure. Defendants have identified no legal process that may have existed to do properly what the Legislature apparently intended to do — revoke the legal possibility of Ms. Neelley's eligibility for parole consideration. Consequently, the Act is an unconstitutional bill of attainder.

Defendants offer three arguments to the contrary, but each is unavailing. First, they incorporate their arguments that the Act does not punish Ms. Neelley for the purposes of the *Ex Post Facto* Clause to argue that the Act does not punish Ms. Neelley for the purposes of the Bill of Attainder Clause. Those arguments are no

more persuasive in the bill-of-attainder context than they are in the *ex-post-facto* context.

Next, Defendants argue that the Act does not have the third element of a bill of attainder because it did not deprive Ms. Neelley of a judicial trial to determine her guilt, which was determined at her capital-murder trial. This argument rests on an overly literal reading of some of the U.S. Supreme Court's bill-of-attainder definitions, one of which describes a bill of attainder as "the substitution of a legislative for a judicial determination of guilt." (Doc. # 81, at 22 (quoting *De Veau v. Braisted*, 363 U.S. 144, 160 (1960) (plurality opinion)).) Although Ms. Neelley's guilt was determined at her criminal trial, she did not receive any comparable form of process before her punishment was legislatively enhanced decades after her conviction. Indeed, the court is unaware of any lawful process to revoke a prisoner's eligibility for parole consideration in the absence of some intervening bad act on the part of the prisoner.

Because of the extraordinary and possibly unique nature of Act 2003-300, the separation-of-powers principles underlying the Bill of Attainder Clause are more instructive than existing definitions of bills of attainder that were crafted in more conventional claims brought under the clause. The U.S. Supreme Court has observed that "the Bill of Attainder Clause was intended not as a narrow, technical (and therefore soon to be outmoded) prohibition, but rather as an implementation of

the separation of powers, a general safeguard against legislative exercise of the judicial function," *United States v. Brown*, 381 U.S. 437, 443 (1965). The Bill of Attainder Clause "also reflected the Framers' belief that the Legislative Branch is not so well suited as politically independent judges and juries to the task of . . . levying appropriate punishment upon . . . specific persons." *Id.* at 445.

Act 2003-300 raises obvious separation-of-powers concerns. As applied to Ms. Neelley, the Act represents a legislative infringement upon the executive's commutation power. And by doing so, the Legislature assumed the task of "levying appropriate punishment upon" Ms. Neelley, a task primarily assigned to the judicial branch subject to modification by the executive branch.

Furthermore, Defendants' argument on this point would also support an absurd result. Say, for example, Ms. Neelley had been sentenced initially to life without the possibility of parole. Following Defendants' logic, the Legislature could later pass a law that enhanced Ms. Neelley's sentence to death that read: "Ms. Judith Ann Neelley, having been duly convicted of capital murder and sentenced to life without the possibility of parole, is hereby sentenced to death." Such an act would not determine Ms. Neelley's guilt any more than Act 2003-300 does and would thus be legal under Defendants' bill-of-attainder definition.

Lastly, Defendants argue that the Act does not "impermissibly target Neelley in the relevant sense" (Doc. # 81, at 22), although they do not deny that Act 2003-

300 targets Ms. Neelley (probably because their clerical-error argument on the *Ex Post Facto* Clause issue necessarily admits that the Act targeted her). This argument relies entirely on *Nixon v. Administrator of General Services*, 433 U.S. 425, in which the U.S. Supreme Court held that a law that named President Richard Nixon and arguably deprived him of his property rights in his presidential papers did not necessarily violate the Bill of Attainder Clause because he "constituted a legitimate class of one." *Id.* at 472.

But *Nixon* is distinguishable, most obviously because Ms. Neelley is not President Nixon. Indeed, multiple Justices in *Nixon* wrote that the Court's holding would have no precedential value. *Id.* at 486 (Stevens, J., concurring) ("[I]n my view, this case will not be a precedent for future legislation which relates, not to the Office of President, but just to one of its occupants."); *id.* at 543 (Burger, C.J.) ("The concurring opinions make explicit what is implicit throughout the Court's opinion, i.e., . . . that the Court's holding 'will not be a precedent.' (quoting *id.* at 486 (Stevens, J., concurring))); *id.* at 544 ("The immediate consequences of the Court's holding may be discounted by some on the ground it is justified by the uniqueness of the circumstances — in short, that the end justifies the means — and that, after all, the Court's holding is really not to be regarded as precedent.").

Defendants also have offered no compelling reason why Ms. Neelley constitutes a legitimate class of one. She of course can be described as a class of

one because she is the only person in Alabama between 1962 and at least 2015 whose death sentence was later commuted to life with the possibility of parole. Defendants suggest that happened because of what the Alabama Legislature may have viewed as "a loophole in Alabama's parole laws that would allow the State's most dangerous convicted murderers out of prison," a loophole that the legislature sought to close via Act 2003-300. (Doc. # 81, at 26.) That amounts to an acknowledgement that the legislature simply thought Ms. Neelley deserved more punishment than a sentence of life with the possibility of parole. *Nixon* certainly does not stand for the proposition that the legislature can single out an individual for punishment because she really deserves it.

Furthermore, the *Nixon* Court's bill-of-attainder holding did not hinge on its description of President Nixon as a legitimate class of one. Rather, the *Nixon* court devoted the vast majority of its bill-of-attainder discussion to its holding that the law before it did not punish President Nixon. *Id.* at 472–84. As the D.C. Circuit put it, "the statute at issue in *Nixon* created a 'legitimate class of one' and served significant public purposes beyond the burdens inflicted on former President Nixon." *Foretich v. United States*, 351 F.3d 1198, 1224 (D.C. Cir. 2003) (quoting *Nixon*, 433 U.S. at 472). Act 2003-300, on the other hand, "creates a vilified class of one with no attendant nonpunitive purposes." *Id.*

In short, Act 2003-300 is an unconstitutional bill of attainder, Defendants arguments notwithstanding.

## VI. CONCLUSION

The foregoing discussion is not meant to suggest that Ms. Neelley's particular crime does not deserve a punishment greater than life with the possibility of parole. That question does not have this court's name on it.

Nor is it a question for the Alabama Legislature to answer. The Alabama Legislature may have disagreed with Governor James's decision to commute Ms. Neelley's sentence to life with the possibility of parole, or perhaps it thought Governor James meant to commute her sentence to life without the possibility of parole. But the Alabama Legislature could not increase her punishment after her death sentence was commuted. The Alabama Legislature's attempt to do so in Act 2003-300 violates the *Ex Post Facto* and Bill of Attainder Clauses of Article I, Section 10 of the U.S. Constitution.

Accordingly, it is ORDERED that Plaintiff's Motion for Summary Judgment (Doc. # 79) is GRANTED and Defendants' second motion for summary judgment (Doc. # 81) is DENIED.

A final judgment will issue separately.

DONE this 30th day of March, 2018.

/s/ W. Keith Watkins
CHIEF UNITED STATES DISTRICT JUDGE
